Date signed September 19, 2012



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | |
|---|---|
| In Re: | |
| Minh Vu Hoang and Thanh Hoang | Case Nos.     05-21078-TJC |
| Debtor(s) | 05-25738-TJC |
| | Chapter   7 |
| | Jointly Administered |
| Gary Rosen, Chapter 7 Trustee | |
| Movant. | |
| vs. | Docket 1567 |
| Minh Vu Hoang | |
| Respondent. | |

## MEMORANDUM OF DECISION

Gary Rosen, the Chapter 7 Trustee (the "Trustee"), brings this turnover motion seeking an order requiring the debtor, Minh Vu Hoang ("Hoang"), to turnover 48.070 carats of diamonds she allegedly acquired post-petition with estate assets. Docket No. 1567. Hoang opposes the

motion.  After a series of evidentiary hearings, the Court finds and concludes that Hoang acquired the diamonds with estate assets, and that the diamonds are property of the estate.  The Court will enter an order requiring Hoang to deliver the diamonds to the Trustee.

## Procedural Background

The Trustee filed the motion on December 16, 2010.  As filed, the motion sought turnover of diamonds allegedly acquired by Hoang in six separate transactions.  Those transactions allegedly involved diamonds and jewelry totaling in excess of $500,000.  The Trustee states that, following discovery, he has determined that five of the transactions were made through Mai Nguyeng, an associate of Hoang.  The Trustee further states that his investigation leads him to conclude that Mai Nguyeng has moved to Vietnam and is not available.  The Trustee therefore determined to proceed solely on the basis of the transaction addressed herein, without prejudice to pursuing the other transactions as circumstances allow. The Court hereby allows the Trustee to sever the turnover claims in the Motion that are based on facts other than those addressed herein, without prejudice to either party in the event the Trustee decides to pursue the remaining claims.

The Court held evidentiary hearings on the motion on December 1, 2011, and January 31, February 1 and 8, and March 2, 2012.  Closing argument was heard on March 9, 2012.  Hoang fully participated in these proceedings by telephone because she is incarcerated for tax fraud and bankruptcy fraud she committed in connection with this case.  This memorandum follows.

## Findings of Fact

*The Bankruptcy Case.*

On May 10, 2005, Hoang filed a voluntary petition under Chapter 11 of the Bankruptcy Code.[1]   Case No. 05-21078.  By order entered on August 9, 2005, the Court ordered the appointment of a Chapter 11 trustee, and the Trustee was approved as Chapter 11 trustee by order of August 31, 2005.  Subsequently, on October 28, 2005, the Court converted the case to Chapter 7.

On July 12, 2005, Thanh Hoang ("Thanh"), Hoang's husband, filed a voluntary petition under Chapter 11.  Case No. 05-25738.  On September 22, 2005, the Court converted the case to Chapter 7.  The next day, the Trustee was appointed to serve as the Chapter 7 trustee in Thanh's case.  By orders entered September 28, 2005, the two bankruptcy cases were ordered to be administered jointly under Case No. 05-21078.  The Trustee continues to serve as the Chapter 7 trustee in both cases.

*The Diamond Purchase.*

David Dahan ("Dahan") first met Hoang in 1990 when she served as his real estate agent for the purchase of a house.  They had little connection after that.  However, Dahan knew that Hoang was involved in foreclosures and real estate investments and was interested in doing some real estate investing.  In 2005 they discussed getting Dahan involved in real estate investments.

Around June of 2005, Hoang instructed Dahan to form a limited liability company. Dahan had his attorney, Richard Stolker, form Rokama, LLC ("Rokama").  Dahan understood that he and Hoang would acquire real estate through Rokama.  It had no activity of which Dahan was aware until March, 2007.

---

[1]  Hereinafter, all references to statutes and to chapters will be to the Bankruptcy Code found at Title 11 of the United States Code, 11 U.S.C. § 101 et seq., unless otherwise noted.

At Hoang's suggestion, Dahan opened a bank account for Rokama at Mercantile Potomac Bank (the "Rokama Account"). On or about March 14, 2007, Hoang presented a check in the amount of $192,518.78 made payable to Rokama and drawn on the account of Pinnacle Title and Escrow, Inc. at Eagle Bank (the "Pinnacle Check"). Exhibit 2 (hereafter "Ex."). Hoang deposited the Pinnacle Check in the Rokama Account on March 15, 2007. Dahan does not know the source of funds that comprise the Pinnacle Check. The Pinnacle Check was the initial deposit in the Rokama Account.

Hoang asked Dahan if he knew anyone who sold diamonds. Dahan told Hoang that his brother was a diamond merchant in Israel. Dahan went to Israel, and at Hoang's direction, told his brother he wanted to buy $180,000 worth of diamonds. Dahan paid for the diamonds by check drawn on the Rokama Account, which he delivered to his brother in Israel. Ex. 4. A few weeks later, Dahan's brother sent a box of diamonds to Dahan's residence in Potomac, Maryland. When Dahan received the diamonds, he called Hoang to tell her they arrived. She went to his house and Dahan gave her the box of diamonds. According to the accompanying invoice, the diamonds weighed 48.70 carats and were valued at $171,000. Ex. 5, pp. 1–2.

A few days later, Hoang asked for an inventory of the diamonds she received. Dahan called his brother to request an inventory, and his brother sent him a list of all of the diamonds, including weight and identification number, that Dahan had given to Hoang. Ex. 5, pp. 3–6. Shortly after receiving the list, Hoang told Dahan that Hoang's sister took the diamonds to have them assessed and was told it was "a good buy." Dahan understood their conversation to mean that Hoang was very satisfied with the purchase.

The balance of the $192,518.78 deposited into the Rokama Account via the Pinnacle Check was disbursed as follows:

- Dahan issued a check in the amount of $1,500.00 on March 22, 2007 to Maia LLC to pay for an appraisal that Hoang ordered.

- A withdrawal was made on April 2, 2007 for $13.60.

- Hoang withdrew $4,950 on or about April 6, 2007. Dahan does not know what Hoang did with the $4,950.

- Hoang made a closing withdrawal of $6,414.59 on or about April 23, 2007. The funds were transferred to an account in the name of Maia, LLC. Hoang used those funds. [2]

Hoang exercised dominion and control over the funds in the Rokama Account, including the Pinnacle Check, except perhaps for the $13.60 withdrawn on April 2, 2007.

*The Forensic Analysis.*

When Hoang filed her case, she identified on her bankruptcy schedules ten entities and five parcels of real estate in which she held an ownership interest. Early in 2006, the Trustee retained Marion Hecht ("Hecht") as a forensic accountant, and she has worked extensively throughout this bankruptcy case. [3] Hecht is a Certified Public Accountant, a Certified Fraud Examiner, a Certified Insolvency and Restructuring Advisor and is Certified in Financial Forensics. She has extensive experience tracing the flow of funds through multi-tiered entities, shell companies, slush funds, and other entities used to divert funds. *See e.g.*, Ex. 91. In numerous adversary proceedings filed by the Trustee in this bankruptcy case, she has been qualified as an expert in the field of forensic accounting and the tracing of funds.

Hecht's primary role has been to investigate the extent of the assets in which the bankruptcy estate held an interest, including determining what assets have been transferred out of the estate and what assets remain in the estate. She and her team have reviewed more than

---

[2] The difference between the sum of the withdrawals and the $192,518.79 deposit represented by the Pinnacle Check is the interest earned on the Rokama Account in the amount of $336.20 in March 2007 and $23.21 in April, 2007. *See* Exs. 3, 9 [Docket 1567].
[3] Hoang raised several challenges to Hecht's testimony. Those challenges are addressed in the Order Denying Debtor's Objections to the Testimony of Marion Hecht, entered simultaneously herewith.

500,000 pages of documents related to approximately 1,000 real estate properties.  These documents include bank statements, checks and other bank records, closing documents, deeds and deeds of trust, court records, files from trustees under deeds of trust, settlement statements and files from settlement companies.   She obtained these documents primarily through subpoenas issued by the Trustee or the investigators of the Internal Revenue Service, with whom she has worked on this matter.  She developed a list of almost 300 individuals, entities, fictitious names and alter egos associated with or used by Hoang in the purchase of real estate at foreclosure sales.

Through her analysis, Hecht has identified many more properties and entities in which Hoang held an interest as of the petition date than the few identified in the schedules.  Hecht also has identified many properties that Hoang acquired post-petition with estate assets without the knowledge of the Trustee.  The Trustee has recovered many of these properties through more than 60 adversary proceedings.  Hecht's forensic analysis often played a primary role in establishing the estate's ownership interest in funds and properties that were previously undisclosed.

In a nutshell, when Hecht identifies records of a parcel of real estate with a connection to Hoang, she undertakes an analysis to determine whether it was acquired with funds or assets that belonged to Hoang as of or before the petition date.  Through this process, Hecht seeks to "vouch" the flow of funds.[4]  Hecht essentially works backward by tracing the source of the funds that were used to acquire the parcel.  Her efforts are often complicated by the fact that portions of the funds used to acquire one parcel may have been the proceeds from the sale of other parcels, and each of those other parcels may have been acquired using funds obtained from the

---

[4] As explained by Hecht, the term "vouch" is an accounting term that is used to describe the process of going backwards to determine the source of particular funds.

sale of any number of still other parcels, and so on.   A further complicating factor is that Hoang acted repeatedly through fictitious names and non-qualified "entities."  Thus Hecht's analysis requires the painstaking tracing of funds and review of documents to ascertain their "providence" -- the term used by Hecht.  The foregoing has been well established in this case, and the Court has presided over the adversary proceedings referred to above.  The foregoing is relevant here because Hecht used these same forensic techniques and body of documents to trace the source of the Pinnacle Check.

Hecht's analysis and the evidence in this contested matter are entirely consistent with the admission made by Hoang in her Plea Statement filed in *United States v Minh Vu Hoang, et al*., Criminal No. DKC-07-172 (D. Md.) (Docket No. 175, Jan. 28, 2010).  There, Hoang admitted:

> Among other things, [Hoang] purchased and sold hundreds of foreclosure properties during 2000 through 2005, using the names of her agents, her entities, and other nominees on certain documents related to the purchase of foreclosure properties. She also used and recycled the names of partnerships and limited liability companies, often reforming the same company with different partners or different asset allocations to conceal her involvement in the purchase and sale of foreclosure properties. In that way, among others, she concealed her control over these assets, and the income generated therefrom, from the IRS and the Bankruptcy Trustee.

Memorandum of Decision [Docket No. 1371] at 4–5.[5]

---

[5] Moreover, Hoang's conduct is consistent with the record established in the course of the entire bankruptcy case:

> The Trustee filed sixty-seven separate adversary proceedings over which this Court has presided or is presiding.  In the vast majority of the adversary proceedings, the Trustee sought to recover real property for the estate that the Debtor failed to disclose on her bankruptcy schedules.  These proceedings required complex and sophisticated legal and forensic investigation and analysis, involving the tracing of funds and tracking deeds, deeds of trust and other instruments through a myriad of fictitious entities and phony entity names, as well as numerous bank accounts.  The Debtor, for example, used the names of more than 450 fictitious or sham partnerships or other entities in her dealings.  These adversary proceedings are accompanied by detailed affidavits and are supported by the many exhibits that are necessary to trace the funds and documents that the Debtor used in the pertinent transactions.

Memorandum of Decision [Docket No. 1371] at 6.

*The Source of the Pinnacle Check.*

Hecht relied on some ninety exhibits and two extensive flow charts to form the opinion that the Pinnacle Check is traceable to assets that were owned by Hoang or Thanh as of or before the petition date.[6]  The Court accepts Hecht's testimony and opinion and makes the following additional factual findings

The Pinnacle Check was issued upon the sale of 3119 Parkway ("Parkway") in Cheverly Maryland.  Parkway was acquired in the name of Rokama for $294,000 through a foreclosure auction held December 13, 2005.  The Memorandum of Purchase of Public Auction states it was acquired by Alex Le, as agent for Rokama.  Le is an associate of Hoang who has been identified as being involved in a number of transactions with Hoang over the life of this case.  Parkway was sold on or about March 7, 2007 for $371,000, generating net cash to the seller of $338,518.78.  Ex. 10.  The Pinnacle Check was a portion of the $338,518.78 net cash proceeds.  Exs. 10, 11.  Thus the Pinnacle Check was issued to Rokama as part of the proceeds from the sale of Parkway on or about March 7, 2007.

*The Source of the Funds to Acquire Parkway.*

As stated, Parkway was acquired in the name of Rokama for $294,000 through a foreclosure auction held December 13, 2005.  After the foreclosure sale was ratified by the Circuit Court of Prince George's County, Maryland, settlement of the Parkway sale occurred on May 10, 2006.  Rokama, as buyer of Parkway, was required to deliver $291,821.29.  Ex. 16.  Rokama did so in the form of three checks, in the amounts of $228,899.56, $45,316.89 and

---

[6] The exhibits were admitted into evidence without objection. Even if an objection were made to them, the Court concludes that the exhibits are the type of "facts and data" that an expert in Hecht's field would reasonably rely on in forming an opinion on this subject.  Fed. R. Evid. 703.  The Court further concludes that the probative value of the exhibits in helping the Court evaluate Hecht's opinion substantially outweighs any prejudicial effect they might have. *Id.*

$17,604.84.  *Id.* These checks, and the sources of the funds represented by these three checks, will be addressed in turn.

*The Source of the $228,899.56 check.*

Isbell General Partnership acquired 2604 Lindell Street, Silver Spring, Maryland ("Lindell") for $159,500 at a foreclosure auction held on October 4, 2002, with a closing on March 17, 2003.  Isbell General Partnership was owned by Hoang and Thanh.   Isbell sold Lindell on May 14, 2003.  The disbursement statement from the sale of Lindell reflects that, among other disbursements, the settling agent, Gemini Title, established a "joined transaction" from a portion of the sales proceeds to "Danoff and King" in the amount of $104,828.66.  Ex 29.  A 'joined transaction' was one in which Gemini Title would hold in escrow proceeds from one settlement to be applied to the settlement on another Hoang parcel on which Gemini Title would serve as settling agent.

The $104,828.66 was used to acquire 6401 Medwick Drive ("Medwick"), Hyattsville, Maryland.  Medwick was acquired through a foreclosure auction held on October 29, 2002, with a closing on May 15, 2003.  The Buyers were "Sam Leopar" and Thanh.  Hoang was listed as the agent for the purchaser on the Memorandum of Public Auction. Ex. 28.  Gemini handled the closing and the $104,828.66 was the amount of cash required by the purchasers at closing.  Ex. 27.  The deed for the sale was recorded in the name of "Sam Leopar" only.

Medwick was sold by "Sam Leopar" for $387,000 on March 31, 2006. Ex. 31. The settlement statement was signed by "Sam Leopar by Alex Le, his POA."  Id.  The net sales proceeds were $361,039.27.[7]  The proceeds were wired to an account titled "Minh Vu Hoang D/B/A Sam Leopar G.P." at PNC Bank.  Ex. 37.  Hoang is listed as the sole owner and signer for

---

[7] The actual proceeds wired into the account were $361,009.27.  Hecht surmised the $30 difference was the wire fee.

that account.  Ex. 33.  The address listed for the account was Hoang's residence in Bethesda, Maryland.

Hoang made two withdrawals from this PNC account on April 11 2006, one in the amount of $183,797.86 and the other for $1,240.  Exs. 38, 39.  She signed two withdrawal tickets to acquire PNC cashier's checks payable to Friedman and McFadden in those two amounts.  *Id*.  These two cashier's checks were used by Hoang to purchase 2207 Afton Street, Temple Hills, Maryland ("Afton") in the name of Rokama.  Afton was acquired at a foreclosure sale on November 9, 2005 for $178,000, although closing occurred in April 2006.  The check for $183,797.86 was used to pay the cash to seller, while the check for $1,240 was paid toward settlement charges.  Ex. 35 pp. 1–2.

Prior to the recording the deed on Afton, the Circuit Court for Prince George's County substituted Tarnesha Stewart as the substitute purchaser.  Afton was then flipped to Ms. Stewart, and Rokama was paid $228,899.56 in a settlement that occurred on April 26, 2006.  Ex. 41, line 507. Specifically, Cosmopolitan Real Estate Settlement, Inc. issued check number 00880 dated April 6, 2006 in the amount of $228,899.56 and payable to Rokoma.   Ex. 42.

*The Source of the $45,316.89 check.*

Prior to their filing the petition, Hoang and Thanh owned an entity named MinBilt Realty. After his appointment, Rosen filed an involuntary petition against MinBilt on November 25, 2005, initiating Case No. 05-90379.  Rosen currently serves as the chapter 7 trustee in the MinBilt case.  Hoang has admitted owning MinBilt with Thanh.  *See* Docket No. 14, Case No 05-90379.

Another of Hoang's entities, MVHP, LLC, acquired 10127 Prince Place, Unit 301, Upper Marlboro, MD ("Prince Place") at a foreclosure sale with an auction date of December 20, 2005

and closing date of March 13, 2006.  A portion of the down payment for the purchase of Prince Place was cash, and therefore not traceable, and the balance of the down payment were two checks, one payable to Hoang and one payable to Thanh.  Exs. 19.  At the closing of the purchase, MVHP, LLC delivered $66,741.26[8] by way of a cashier's check issued by BB&T Bank.  The cashier's check was acquired from BB&T by a check in the same amount drawn on the account of MinBilt, signed by Thanh.  Hoang and Thanh were the sole signatories of the MinBilt account.

MVHP, LLC sold Prince Place on May 5, 2006, to Reginald Rogers for $188,000, and the net sale proceeds were $131,235.12. Ex. 23. The net sales proceeds of $131,235.12 were wired into the account of MVHP, LLC at United Bank.  Hoang is the sole signer for this MVHP, LLC account, and her home address was listed as the address for MVHP, LLC.  Hoang then wrote and signed a check to United Bank on this account to acquire the cashier's check dated May 11, 2006, in the amount of $45,316.89 payable to Bierman Geesing and Ward, who were the settlement agents on the sale of Parkway to Rokama.

*The source of the $17,604.84 check.*

Establishing the source of the $17,604.84 check is not as necessary to the turnover action as the source of the two other checks.  As stated above, Parkway was acquired with funds in the total amount of $291,821.29, including the $17,604.84 check.  Thus the $17,604.84 represented approximately 6% of the funds used to acquire Parkway, while the $228,899.56 check and the $45,316.89, which have now been established to be proceeds of property of the estate, represented 94% of those funds.   Thus, even assuming the $17,604.84 check could not be traced to property of the estate, ninety-four percent (94%) of the proceeds from the sale of Parkway

---

[8] When printed, the Settlement Statement showed that a balance of $66,741.26 was due at closing. Ex. 17. The amount of 66,741.26 is struck through in handwriting and the figure of 66,755.51 is interdelineated in handwriting. Exhibit 17 reflects that the per diem rate of interest in $14.25.

would be property of the estate.  The Trustee seeks turnover of the diamonds acquired with $180,000 of the proceeds from the Parkway sale; that amount represents 53 % of the net Parkway sales proceeds of $338,518.78.  Ex. 10.    Thus even if the $17,604.84 check is not traceable to property of the estate, the Trustee could still prevail on the turnover action.

Nevertheless the evidence established that $17,604.84 check is traceable to property of the estate, albeit perhaps not as directly as the $228,899.56 check and the $45,316.89 check. *See*, Exs. 92, 93.  This was established by the detailed testimony of Hecht, supported with exhibits and charts.  In a nutshell, the sourcing commence with five properties, Delaware Drive, Dulaney Mill Drive, Harrison Lane, Medallion Drive and Marlborough Circle, all of which are traceable to Hoang or entities in whose name she conducted business. The proceeds from the sale of these properties are traceable into two Hoang accounts, SunTrust xxxxxxxx0951 and Suntrust xxxxxxxx3143.  Hecht traced these funds to a check out of SunTrust xxxxxxxxx3143 in the amount of $208,576.72 that was used to acquire 5404 White Main, Columbia, Maryland. ("White Main").  White Main was acquired for $224,000 at a foreclosure sale on June 8, 2005, with a closing date of August 25, 2005; it was sold on March 24, 2006 for $300,000.  The sales proceeds were used to purchase 576-c Wilson Drive, Oxon Hill Maryland ("Wilson"), which was acquired for $118,000 at a foreclosure sale on December 9, 2005 with a closing date of March 30, 2006.  Wilson was sold on April 25, 2006 for $185,000.  The $17,604.84 check was issued as a result of the sale of Wilson.

With respect to all the entity names used by Hoang throughout these transactions, no formalities were followed.  Funds from one transaction flowed into another transaction, in the name of one nominal entity or another.

## Conclusions of Law

The commencement of a bankruptcy case creates an estate that is comprised of all of the debtor's legal and equitable interests in property. *See* 11 U.S.C. §541(a)(1). Property of the estate encompasses a broad range of property and includes all legal or equitable interests of the debtor in property as of the commencement of the case wherever located and by whomever held. § 541(a). Property of the estate includes property that the estate acquires after the commencement of the case and, significantly here, proceeds from property of the estate. §541(a)(6), (7); *In re Bogdan*, 414 F.3d 507, 512 (4th Cir. 2005).

The Bankruptcy Code provides a trustee with powers to obtain property of the estate. Here, the Trustee seeks turnover of the diamonds and funds pursuant to §542(a), which provides:

> (a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

§542(a). "The primary condition of relief [by turnover] is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so." *Hager v. Gibson*, 109 F.3d 201, 211 (4th Cir. 1997) (quoting *Maggio v. Zeitz*, 333 U.S. 56, 63 (1948)). "Present possession, either actual or constructive, of the property or its identifiable proceeds, by the person from whom turnover is sought, is required for recovery" under §542. *Id*. at 210.

Here the evidence established that Hoang acquired diamonds for $180,000 in March 2007.[9] These facts were established by the testimony of Dahan, whom the Court found entirely

---

[9] While the party seeking turnover of property of the estate has the burden of proof, the applicable standard of proof is subject to debate. *See Alofs Mfg. Co. v. Toyota Mfg. Ky*, 209 B.R. 83, 89–91 (Bankr. W.D.Mich. 1997)

credible on the matters to which he testified.  The testimony was fully corroborated by documents establishing the salient points of Dahan's testimony – bank statements, checks, invoices, diamond inventory, etc.

Next, Hoang's purchase of the diamonds is not subject to a turnover motion unless she acquired them with property of the estate, including "its identifiable proceeds."  *Id*.  The evidence established, and the Court concludes, that Hoang used the Pinnacle Check funds to acquire the diamonds, and the Pinnacle Check funds were identifiable proceeds of property of the estate.

Hoang does not admit she acquired the diamonds, but she asserted her Fifth Amendment right and did not testify.  Because she chose not to testify, the Court does not give weight to her factual statements in opening or closing remarks denying the purchase, as they are not made under oath or otherwise supported by an evidentiary record.  Even if the Court were to consider her general denials, they are overridden by the substantial weight of the testimony and documentary evidence to the contrary.

Hoang contends that the Trustee should not pursue the turnover motion because the cost of unraveling and tracing the funds is out of proportion to the benefit the estate will realize by recovering the diamonds.   The simple answer, of course, is that if Hoang turned over the diamonds to the Trustee all of the cost would have been avoided.  In any event, as stated above, the complicated labyrinth of fictitious names, numerous bank accounts and check transfers used by Hoang is well known to the Court, having presided over more than 60 adversary proceedings in which the Trustee and his professionals were required to take painstaking forensic efforts to

---

(discussing the arguments for both the clear and convincing and preponderance of evidence standards); *Springel v. Prosser*, 2011 Bankr. LEXIS 411, *162 (Bankr. D.V.I. Feb. 9 2011) (unpublished decision) (stating that the growing majority of courts apply the preponderance of evidence standard).  Although the Court does not adopt the clear and convincing standard of proof here, nevertheless, it was met by the Trustee.

trace funds back to undisclosed estate assets. *See, e.g.*, Memorandum of Decision [Docket No. 1371] at 6. Much of this process would have occurred whether or not the Trustee located the diamond purchase.

Hoang also contends that the Court's refusal to allow her to retain an attorney to be paid by the estate deprives her of the ability to defend the motion. On several occasions, the Court has rejected Hoang's request for the appointment of counsel to represent her personally but to be paid by the estate, and does so again here. *See e.g.*, Order Denying Application for Order Approving Employment of Counsel *Nunc Pro Tunc*, Docket No. 1505.

Finally, the Court notes that this case does not present the issue raised in *Hoang v. Dahan*, 469 B.R. 606 (D.Md. 2012). There, in one of the many adversary proceedings brought by the Trustee seeking to unwind Hoang's undertakings, the Trustee brought a §542 action against Dahan. The Trustee sought to recover the value of property that Dahan had transferred, arguing that the transferred property had been property of the estate and therefore Dahan had to turnover its value, relying on the language of §542. In rejecting the Trustee's reading of §542, Chief Judge Chasanow concluded that the following three-pronged analysis applied:

> (1) §542 entitles the trustee to possession of property of the estate; (2) property that is transferred is not property of the estate; and (3) the property at issue . . . was transferred.

*Id*. at 615. The property the Trustee sought to recover had been transferred by Dahan. The district court concluded that because it was no longer property of the estate it could not be the subject of the trustee's turnover action. *Id*. at 621–23. In contrast, here the action is against the debtor, not a third party. Moreover, Hecht's analysis established that Hoang was in possession of proceeds of property of the estate through each step of the tracing analysis. Thus the cash used by Hoang to purchase the diamonds was proceeds of property of the estate (and therefore

property of the estate) and thus the diamonds are proceeds from property of the estate (and

therefore property of the estate).

## Conclusion

For the foregoing reasons, the Court will enter an order granting the motion and requiring

Hoang to turnover to the Trustee the diamonds, or the value of the diamonds, within fourteen

days.

Cc:    Minh Vu Hoang
        Thanh Hoang
        Gary Rosen, Chapter 7 Trustee
        Trustee's counsel

## End of Memorandum